[No. C032534. Third Dist. Jan. 27, 2003.]

SANCTITY OF HUMAN LIFE NETWORK et al., Plaintiffs and Appellants, v.
CALIFORNIA HIGHWAY PATROL, Defendant and Respondent.

## COUNSEL

Law Offices of Scott M. Kendall and Scott M. Kendall for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, David S. Chaney, Assistant Attorney General, James M. Schiavenza, Jacob Appelsmith, Nina Thomson and Kenneth L. Swenson, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**NICHOLSON, J.**—Members of the Sanctity of Human Life Network (plaintiffs) stood on sidewalks of freeway overpasses during rush hours and held signs, visible to motorists below on the freeways, communicating their views concerning abortion. Responding to reports of freeway congestion caused by plaintiffs'· activities, officers of the California Highway Patrol (CHP) directed plaintiffs to terminate their activities.

Plaintiffs filed this injunctive and declaratory relief action, seeking to enjoin the CHP from interfering with their display of handheld signs on freeway overpasses during rush hours on January 22, the anniversary of the United States Supreme Court's decision in *Roe v. Wade* (1973) 410 U.S. 113 [93 S.Ct. 705, 35 L.Ed.2d 147]. After trial, the court entered judgment in favor of the CHP.

We find that the statutes, Vehicle Code sections 21465 and 21467, under which the CHP claimed the power to terminate plaintiffs' activities, do not apply to plaintiffs' activities. However, we also conclude the CHP, under the facts presented at trial, acted appropriately pursuant to its authority to direct traffic. (See Veh. Code, § 2410.) We further conclude that the CHP's actions in this case did not violate plaintiffs' free speech rights. Accordingly, we modify the trial court's judgment to grant to plaintiffs declaratory relief only to the extent of declaring that the CHP may not interfere with plaintiffs' activities under the authority of Vehicle Code sections 21465 and 21467 and otherwise affirm the judgment. (Hereafter, unspecified code citations are to the Vehicle Code.)

TRIAL COURT PROCEEDINGS

As reflected in the statement of decision, the issue litigated at trial was whether plaintiffs can display handheld signs from freeway overpasses to the traffic below during rush hours on January 22, the *Roe v. Wade* anniversary date. In 1997 and 1998, the CHP ordered plaintiffs to take down the signs. The CHP intends to continue to issue such orders under the authority of sections 21465 and 21467 (governing display of traffic signs and declaring every prohibited sign a public nuisance) and Penal Code section 372 (relating to failure to remove a public nuisance). While plaintiffs objected to the statement of decision on several grounds, they did not dispute these facts.

For purposes of trial, the parties stipulated that (1) plaintiffs conducted their demonstrations on sidewalks on freeway overpasses rather than in the roadway, (2) the freeway overpasses involved are enclosed with cyclone fencing so there is no danger of signs falling onto the freeway, and (3) plaintiffs do not claim a right to attach their signs to public property.

On January 22, 1997, plaintiffs held signs on four freeway overpasses between 6:30 and 8:30 in the morning. An officer of the CHP arrived at one of the locations about 7:30 a.m. After some discussion concerning plaintiffs' right to display the signs and the arrival of other officers, the officers took plaintiffs' signs. At other overpasses, CHP officers told plaintiffs they must leave, which they did.

In 1998, plaintiffs displayed their handheld signs on freeway overpasses during rush hour the morning of January 21 until they were told to leave by CHP officers. The CHP officers were dispatched to the freeway overpasses in response to complaints that plaintiffs' activities were causing freeway congestion. Plaintiffs were told they had to remove the signs. On the afternoon of January 22, 1998, plaintiffs planned to gather on freeway overpasses, displaying their handheld signs, between 3:30 and 5:00 p.m. At one overpass, at approximately 4:30 p.m., officers of the Sacramento Police Department arrived, cited plaintiffs and told them they had to leave. CHP officers were present but did not interact with plaintiffs. Plaintiffs held signs and demonstrated on unspecified dates in locations other than freeway overpasses with no interference from the CHP.

DISCUSSION

I

*Vehicle Code Traffic Sign Statutes*

As noted, the CHP has terminated plaintiffs' activities on freeway overpasses under the purported authority of sections 21465 and 21467. The CHP

officers who testified at trial stated they would continue to remove prohibited signs in view of freeway motorists under this authority, although the officers were less than clear concerning what is a prohibited sign. Plaintiffs assert these Vehicle Code sign statutes do not apply to their signs. After consideration of the statutes, their context within the Vehicle Code, and their legislative history, we agree with plaintiffs that sections 21465 and 21467 do not apply to their signs.

While section 21465 prohibits certain signs, section 21467 merely provides authority for the CHP to remove such prohibited signs. We therefore focus on section 21465.

Section 21465 is found in division 11, chapter 2, article 3 of the Vehicle Code. Division 11 relates generally to rules of the road, while chapter 2 of division 11 relates to traffic signs, signals, and markings, and article 3 of that chapter designates offenses relating to traffic devices.

Section 21465 provides: "No person shall place, maintain, or display upon, or in view of, any highway any unofficial sign, signal, device, or marking, or any sign, signal, device, or marking which purports to be or is an imitation of, or resembles, an official traffic control device or which attempts to direct the movement of traffic or which hides from view any official traffic control device." There are two categories of prohibited signs, signals, devices, and markings under the language of the statute. They are (1) unofficial signs, signals, devices, or markings and (2) signs, signals, devices, or markings which (a) purport to be or are imitations of, or resemble, an official traffic control device, (b) attempt to direct the movement of traffic, or (c) hide from view any official traffic control device. Plaintiffs' signs did not meet the description of signs in the second category. Therefore, we must determine whether plaintiffs' signs were prohibited because they are in the first category.

We need not consider what is a signal, device, or marking because it has been agreed throughout this litigation that what plaintiffs were displaying were signs. An "unofficial sign," as opposed to an official sign, appears to be a traffic sign not placed by governmental entities, although nowhere in the Vehicle Code is "unofficial sign" defined. (See § 21351 [allowing governmental entities to place traffic signs, signals and other traffic control devices].)

During trial, the CHP's expert on the Vehicle Code, Officer Scott Hall, who teaches the Vehicle Code at the Highway Patrol Academy and is authorized to speak authoritatively concerning the meaning of the Vehicle

Code for the CHP, testified concerning the CHP's enforcement of section 21465. His testimony reveals that the CHP does not have a clear or articulable definition of the scope of section 21465. Asked to explain the presence, considering section 21465, of certain signs within view from the freeway, Officer Hall testified: "Well, first of all, we don't enforce these signs. We enforce the official traffic control devices. We teach these are what they are. [*Sic.*] [¶] These signs here are enforced by another department. I don't know if they have permits. I don't know if they're exempt from a permit. [¶] The fact that they're there tells us that somebody else who regulates these signs has either given them permission or has allowed them to be there." While he agreed billboards are unofficial signs, he simply stated that the CHP does not "enforce these signs." He continued: "There's two different types of signs. There's official, and there's permitted. [¶] An official sign regulates, warns and guides. The Department of Transportation puts up official signs. That's what we enforce. [¶] Anything else is unofficial. Unless you have a permit or you're exempt, you can't have it. That's what it is." The CHP's view is that bus advertising and bumper stickers do not violate section 21465. When asked why that is so, the officer replied: "You got me." Finally, Officer Hall testified that determination of what a prohibited sign is under section 21465 is purely a matter of discretion for the CHP: "[I]f this sign were a visual hazard, we would investigate it and go up to 'em, find out if they had a permit for it and what the parameters of it were for. [¶] That's what 21467 says. If we deem it a visual hazard, we can take it down."

In the Vehicle Code, a "highway" is "a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel. Highway includes street." (§ 360.) This broad definition is consistent with the CHP's understanding and enforcement efforts. Officer Hall testified that a "highway" is "pretty much any road that encompasses the main travel portion of the roadway, sidewalks, et cetera."

Applying these definitions to the terms used in the Vehicle Code, section 21465 prohibits any unofficial sign, meaning any nongovernmental traffic sign, in view of any public place used for vehicular traffic. What is a traffic sign is the only ambiguity remaining. The plain meaning of "unofficial sign," taken out of the context of the statutory scheme relating to traffic signs, might suggest that the statute refers to any sign, traffic related or not, that was not placed there by the government. While the plain meaning, without consideration of the context, may lead to this interpretation, other canons of statutory interpretation preclude this interpretation.

The goal of statutory interpretation is to determine and apply the Legislature's intent. (*Collection Bureau of San Jose v. Rumsey* (2000) 24

Cal.4th 301, 309-310 [99 Cal.Rptr.2d 792, 6 P.3d 713].) That intent .is typically determined from the plain meaning of the statute. If, however, application of an apparently unambiguous statute would lead to an absurd result, the court can presume the Legislature did not intend the apparent meaning. In such cases, the court must engage in further statutory construction. (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1334, fn. 7 [283 Cal.Rptr. 893, 813 P.2d 240].)

It cannot be seriously argued that the Legislature intended to prohibit any unofficial sign in view of a roadway. This would include billboards, house numbers, bus advertising, bumper stickers, and a host of other signs that are everywhere to be found in view of roadways. The prohibition in section 21465 bears no contextual relation to state statutes and local ordinances concerning private signs. Furthermore, the Legislature did not intend to prohibit unofficial signs only in view of a freeway. "Highway" has a specific meaning, including "streets," in the Vehicle Code (§ 360), and modern freeways did not exist when the predecessor of section 21465 was enacted in 1929. (See former § 81.5 [enacted in 1957, defining "freeway"].)

We must construe statutes in the context in which the Legislature placed them. (*Collection Bureau of San Jose v. Rumsey, supra,* 24 Cal.4th at p. 310.) Here, section 21465 is part of comprehensive legislation concerning traffic signs. It does not purport to govern any other type of sign. As noted above, chapter 2 of division 11 of the Vehicle Code relates to traffic signs, signals, and markings, and article 3 of chapter 2 provides for offenses related to those traffic devices. The context of section 21465 supports the conclusion that the Legislature did not intend to regulate all nongovernmental signs, only those relating to traffic. For example, a private landowner cannot post a speed limit sign within view of the roadway. The same landowner, however, does not violate section 21465, interpreted in its context as a prohibition on private traffic signs, by posting a "no trespassing" sign visible from the roadway.

One might argue that the first category of prohibited signs in section 21465—unofficial signs—must be interpreted separately from the second category of prohibited signs—signs which purport to be or are an imitation of, or resemble, an official traffic control device or which attempt to direct the movement of traffic or which hide from view any official traffic control device—in order to give effect to the term "unofficial sign." This approach to the interpretation of the statute raises as many problems as it solves. For example, if the second category of signs is interpreted without regard to the first category, even official traffic signs are prohibited because an official

traffic sign certainly purports to be an official traffic control device. Construing the two categories together to prohibit only unofficial traffic signs is the only way to avoid results obviously unintended by the Legislature.

The legislative history of section 21465 supports this contextual interpretation of that provision. The first predecessor of section 21465, former section 114 1/2, subdivision (b), enacted in 1929, provided: "It shall be unlawful for any person to place or maintain or to display upon or in view of any street or highway any unofficial sign, signal or device which purports to be or is an imitation of or resembles an official traffic sign or signal, or which attempts to direct the movement of traffic or which hides from view any official traffic sign or signal." (Stats. 1929, ch. 253, § 46, p. 538.) As can be seen, the class of prohibited signs is not broken down into two categories. "Unofficial sign" is joined with "which purports to be or is an imitation of or resembles an official traffic sign . . . ."

The pattern for the 1929 provision was section 13 of the Uniform Motor Vehicle Act Regulating the Operation of Vehicles, one of four separate acts comprising the Uniform Motor Vehicle Code. When codifying former section 114 1/2, subdivision (b), the Legislature adopted the language of the uniform act, as did 44 other states by 1937. (11 Uniform Laws Annotated (1938) Motor Vehicles, pp. 5, 16; Rep. of the Assem. Interim Com. on Motor Vehicle Laws (1937) p. 5 (1937 Assembly Report).)

In 1933, the Legislature requested the California Code Commission to prepare a recodification of all existing motor vehicle laws. The next year, the code commission presented to the Legislature the Proposed Vehicle Code and commented: "The California Code Commission . . . has endeavored to draft the Vehicle Code without effecting any substantive changes, except those to which attention is called in the notes following this preface." (Proposed Veh. Code, Cal. Code Com. (1934) p. v.) The notes did not mention the section at issue here and, thus, no substantive change was intended. (*Id.* at pp. vii-xiii.) This recodification, "being merely a codification of then existing laws," was enacted in 1935. (1937 Assem. Rep., p. 5.) During this recodification process, former section 473, subdivision (a), in place of former section 114 1/2, subdivision (b), was enacted. The new section contained the modern language splitting the prohibited signs into two categories. It provided: "No person shall place, maintain or display upon, or in view of, any highway any unofficial sign . . . or any sign . . . which purports to be or is an imitation of, or resembles, an official traffic sign . . . ." (Stats. 1935, ch. 27, p. 169.) In 1959, the section number of the statute was changed to section 21465, as it currently stands. (Stats. 1959, ch. 3.)

The change in wording of the statute, splitting the prohibited signs into two categories, was, therefore, not meant to be a substantive change to the statute. It is unclear why the Code Commission made that change. No other state has done so. For example, Colorado's statute provides: "No person shall place, maintain, or display upon or in view of any highway any unauthorized sign, signal, marking, or device which purports to be or is an imitation of or resembles an official traffic control device or railroad sign or signal, or which attempts to direct the movement of traffic, or which hides from view or interferes with the effectiveness of any official traffic control device . . . ." (Colo. Rev. Stat. § 42-4-606.) This specific language is found in most state statutes. (See, e.g., Ala. Code § 32-5A-36; Ark. Code Ann. § 27-52-109; Conn. Gen. Stat. Ann. § 14-310.)

Accordingly, the legislative history of section 21465 is consistent with what we have concluded is the statute's reasonable interpretation—that is, that it applies only to traffic signs and was never intended to do more. Plaintiffs' signs cannot be characterized as traffic signs subject to prohibition under section 21465. They did not purport to be traffic signs. They did not imitate or resemble traffic signs. The signs did not attempt to direct the movement of traffic or hide from view any traffic sign. The CHP, relying only on sections 21465 and 21467, cannot prevent plaintiffs from displaying the signs.

Plaintiffs have presented an actual controversy concerning whether the CHP may interfere with plaintiffs' activities under the authority of sections 21465 and 21467. We conclude the CHP may not do so. Therefore, plaintiffs are entitled to declaratory relief on that issue. (See Code Civ. Proc., § 1060 [authorizing declaratory relief when actual controversy presented].) Since sections 21465 and 21467 do not apply, we need not consider whether their application would violate plaintiffs' free speech rights.

## II

### Injunctive Relief

Although the CHP purported to act pursuant to sections 21465 and 21467, which do not provide authority for the actions taken, injunctive relief is not available if it would have the effect of preventing the execution of a public statute by officers of the law for the public benefit. (Code Civ. Proc., § 526, subd. (b)(4).) Under the facts of this case, an injunction could have the effect of preventing the CHP from executing its beneficial function of directing traffic pursuant to section 2410.

"Members of the California Highway Patrol are authorized to direct traffic according to law, and, in the event of a fire or other emergency, or to

expedite traffic or insure safety, may direct traffic as conditions may require notwithstanding the provisions of this code." (§ 2410.) Traffic includes pedestrians. (§ 620.) ■ The record shows that the CHP acted to terminate plaintiffs' activities on freeway overpasses only when those activities were causing freeway congestion. Thus, under the authority of section 2410 allowing the CHP to "direct traffic . . . to expedite traffic . . . as conditions may require . . . ," the actions taken by the CHP conformed to their statutory authority.

During the testimony of a CHP officer, the effect of section 2410 as broad authority to direct traffic was raised but not explored. Its application to this case was not considered. The statute was mentioned in a footnote in plaintiffs' opening brief, but only to say that the CHP did not claim this section as justification for its actions. Finally, in response to the request for supplemental briefing in which this court asked whether the CHP has inherent authority to exclude communicative activities from freeway overpasses, the CHP cited its authority under section 2410. Consideration of section 2410 goes to the question of whether plaintiffs are entitled to the injunctive relief requested. We conclude that an injunction on CHP interference with plaintiffs' activities might have the effect of preventing the execution of a public statute for public benefit. Therefore, plaintiffs are not entitled to injunctive relief. (Code Civ. Proc., § 526, subd. (b)(4).)

On appeal, plaintiffs assert that application of sections 21465 and 21467 to their signs violates their free speech rights because it has the effect of prohibiting their signs while other signs (billboards and other advertising) containing commercial speech are allowed. Our conclusion that sections 21465 and 21467 are inapplicable makes it unnecessary to reach this contention. Plaintiffs also contend, however, that the CHP has unconstitutionally broad discretion in determining whether to interfere in plaintiffs' activities because, in plaintiffs' words, the CHP "can offer no statute that purports to be a reasonable time, place, manner restriction that is narrowly tailored . . . ."

Understandably, plaintiffs did not contend in the trial court that section 2410 violates their free speech rights as applied in this case. The CHP did not assert section 2410 as authority for its actions. The focus of this action has been, as noted in the statement of decision, whether the CHP's intended enforcement of sections 21465 and 21467 will prevent plaintiffs from displaying their signs. However, the CHP's knowledge of the scope of its authority has no bearing on that authority.

■ Under the narrow facts of this case, we conclude that the CHP's actions, authorized by section 2410, did not violate plaintiffs' free speech

rights. ■ The government may place restrictions on free speech on streets to permit free flow of traffic, which is the main purpose of a street, even if an incidental purpose of providing a forum for free speech is served. "Regulations of the use of a public forum that ensure the safety and convenience of the people are not 'inconsistent with civil liberties but . . . [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend.' *Cox v. New Hampshire,* 312 U.S. 569, 574 [61 S.Ct. 762, 765, 85 L.Ed. 1049, 133 A.L.R. 1396] (1941)." (*Thomas v. Chicago Park Dist.* (2002) 534 U.S. 316, 323 [122 S.Ct. 775, 780, 151 L.Ed.2d 783, 791].) "[T]he exercise of First Amendment rights may be regulated where such exercise will unduly interfere with the normal use of the public property by other members of the public with an equal right of access to it." (*Food Employees v. Logan Plaza* (1968) 391 U.S. 308, 320-321 [88 S.Ct. 1601, 1609, 20 L.Ed.2d 603, 613].) Time, place, and manner restrictions on free speech " 'must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication.' *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130 [112 S.Ct. 2395, 2401, 120 L.Ed.2d 101, 112 (1992); see also *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 [104 S.Ct. 3065, 3068-3069, 82 L.Ed.2d 221] (1984)." (*Thomas v. Chicago Park Dist., supra,* 534 U.S. at p. 323, fn. 3 [122 S.Ct. at p. 780].) The state has a strong interest in ensuring the free flow of traffic on roadways. (*Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753, 768 [114 S.Ct. 2516, 2526, 129 L.Ed.2d 593, 601]; *Planned Parenthood Shasta-Diablo, Inc. v. Williams* (1995) 10 Cal.4th 1009, 1020-1023 [43 Cal.Rptr.2d 88, 898 P.2d 402].)

■ Here, the CHP's actions were not based on the content of the message, served the significant governmental interest of allowing traffic to flow freely on the freeways, and left open ample alternatives for plaintiffs to communicate their message in other forums. Although the parties differ dramatically on whether, and under what circumstances, a freeway overpass is a public forum, it is unnecessary to decide that issue in this case because, even assuming freeway overpasses are public forums, the CHP's actions, authorized by section 2410, did not violate plaintiffs' free speech rights. (See *Faustin v. City, County of Denver, Colorado* (10th Cir. 2001) 268 F.3d 942, 949-950 [sidewalk of highway overpass is a traditional public forum].) ■ "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (*Lyng v. Northwest Indian Cemetery Prot. Assn.* (1988) 485 U.S. 439, 445 [108 S.Ct. 1319, 1323, 99 L.Ed.2d 534, 544]; see also *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230-231 [45 Cal.Rptr.2d 207, 902 P.2d 225].)

The Legislature has never spoken concerning the issue of expressive activities on freeway overpasses. If it is the terrifying problem the dissent suggests, perhaps the Legislature should deal with the issue. A specific and narrowly tailored statute would establish California's public policy in this regard and give the courts a point of reference for application of constitutional principles.

The CHP discontinued plaintiffs' activities on the freeway overpasses, under the facts of this case, only when the activities were causing traffic congestion on the freeways below. Therefore, section 2410, on its face, allowed the CHP to direct plaintiffs to move on "to expedite traffic . . . ."

Given this conclusion, it is unnecessary and would be premature for us to determine whether the CHP can prevent the plaintiffs from demonstrating when the activities are not causing traffic congestion. For example, we need not determine whether the CHP can prevent plaintiffs' activities on freeway overpasses *at any time* to "insure safety . . ." (§ 2410) or for other reasons. While it may be argued that allowing the CHP to prevent plaintiffs' activities on freeway overpasses based solely on safety concerns may delegate discretion to enforcing officers that is unconstitutionally broad (see *Cox v. Louisiana* (1965) 379 U.S. 536, 557-558 [85 S.Ct. 453, 465-466, 13 L.Ed.2d 471, 486] [only limited discretion may be vested in enforcing authorities]), the question is not presented here.

Because we conclude the CHP's actions were authorized by section 2410 and did not violate plaintiffs' free speech rights, plaintiffs are not entitled to injunctive relief. Accordingly, the portion of the trial court's judgment denying injunctive relief must be affirmed.

III

*Declaratory Relief*

Beyond the declaration that the CHP may not use sections 21465 and 21467 as authority to interfere with plaintiffs' activities, this action does not present a proper case for declaratory relief. The issue of what the CHP can and cannot do in situations not substantially similar to the facts presented here cannot be the subject of a declaration concerning plaintiffs' rights because we can only speculate concerning what the conditions of future encounters between plaintiffs and the CHP will be.

"Any person . . . who desires a declaration of his or her rights or duties with respect to another . . . , may, in cases of actual controversy relating to

the legal rights and duties of the respective parties, bring an original action . . . for a declaration of his or her rights and duties . . . ." (Code Civ. Proc., § 1060.)

A plaintiff may bring an action for declaratory relief before an actual invasion of rights has occurred. (*Burke v. City etc. of San Francisco* (1968) 258 Cal.App.2d 32, 34 [65 Cal.Rptr. 539].) However, the action must be based on an actual controversy with known parameters. If the parameters are as yet unknown, the controversy is not yet ripe for declaratory relief. (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170-171 [188 Cal.Rptr. 104, 655 P.2d 306].)

"The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy. On the other hand, the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question. [Citations.]

". . . 'The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. [Citation.] It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' . . . 'The "actual controversy" referred to in [Code of Civil Procedure section 1060] is one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. The judgment must decree, not suggest, what the parties may or may not do.' [Citation.] . . . 'The principle that courts will not entertain an action which is not founded on an actual controversy is a tenet of common law jurisprudence, the precise content of which is difficult to define and hard to apply. . . . A controversy is "ripe" when it has reached, but has not passed, the point that the facts have

sufficiently congealed to permit an intelligent and useful decision to be made.' [Citation.]" (*Pacific Legal Foundation v. California Coastal Com., supra,* 33 Cal.3d at pp. 170-171.)

█ The focus of this litigation has been the applicability of sections 21465 and 21467 and the constitutionality of the CHP's enforcement of those statutes. The parties did not litigate the CHP's enforcement of other statutes or the constitutionality of such enforcement. While it is necessary for us to consider, under the current facts, the applicability of section 2410 because plaintiffs seek injunctive relief and we cannot grant injunctive relief if it would have the effect of preventing enforcement of a public statute for the public's benefit (see Code Civ. Proc., § 526, subd. (b)(4)), we are not in a position to know the parameters of future relations between plaintiffs and the CHP. Indeed, those relations may change simply because the CHP is now on notice that sections 21465 and 21467 do not apply to plaintiffs' activities.

The issue of whether plaintiffs may hold their signs on freeway overpasses under circumstances not presented by the facts of this case is not ripe. Many variables, such as traffic congestion, safety, and the exercise of the CHP's statutory authority, may combine to change whether the CHP may appropriately interfere with plaintiffs' activities in any given situation. Furthermore, CHP interference could be presented that, unlike here, would violate plaintiffs' free speech rights. If such a situation were presented, the issue of whether the freeway overpass is a public forum would also be ripe. We cannot, however, make a declaration at this point that will be applicable under all scenarios. Since the controversy, beyond the application of the Vehicle Code sign statutes as discussed above, does not admit of definitive and conclusive relief by judgment, as distinguished from an advisory opinion upon hypothetical facts, there is no actual controversy pursuant to Code of Civil Procedure section 1060, and plaintiffs are not entitled to declaratory relief beyond the declaration of rights already discussed.

CONCLUSION

The judgment is modified to grant plaintiffs declaratory relief in that the CHP may not rely on Vehicle Code sections 21465 and 21467 as authority to interfere with plaintiffs' activities while plaintiffs are standing on the sidewalks of freeway overpasses and holding nontraffic signs visible to the motorists below on the freeway. As modified, the judgment is affirmed. Plaintiffs shall recover their costs on appeal.

Raye, J., concurred.

**RAYE, J.**—I fully concur in Justice Nicholson's well-reasoned analysis and conclusion that the California Highway Patrol (CHP) may not rely on

Vehicle Code sections 21465 and 21467 as authority to interfere with plaintiffs' activities under the facts presented, but acted properly in dispersing plaintiffs under Vehicle Code section 2410.

I write separately to emphasize my disagreement with several aspects of my dissenting colleague's views. I disagree with his cataclysmic vision of the havoc that will be wreaked when citizens are permitted to exercise their First Amendment rights on public property within sight of a freeway. I do not share his view of police power: that we presume police authority to act absent a constitutional prohibition to the contrary. And while I agree with the majority that we need not reach the issue in this case, I am not persuaded by the dissent's public forum analysis.

The dissent evokes images of freeways strewn with human carcasses and wrecked automobiles—the detritus of high-speed collisions between drivers distracted by activity on freeway overpasses—overpasses teeming with demonstrators competing to display their messages to the motoring public. There is no basis for such wild imaginings. While the parties may have wished for a more expansive holding, our task is to decide the case before us. This is a case about four specific overpasses populated by a given number of protestors at particular points in time. Not all overpasses are the same. An overpass crossing Highway 99 in Turlock may be an effective protest platform, particularly if the target audience happens to be local citizens, but sign-waving protestors stationed on such an overpass would have ·a negligible impact on sparse freeway traffic. The same cannot be said of the urban overpasses at issue in this case. The dissent lumps them all together and insists that a single rule should apply to all.

The dissent's conclusion in this regard seems premised on the unsupportable notion that signs on freeway overpasses inevitably disrupt traffic on the underlying freeway and on largely irrelevant principles of real property law. After acknowledging decisions by the United States Supreme Court that public streets are "traditional" and "quintessential" public forums, the dissent makes the imminently reasonable observation that freeways are not the type of streets the Supreme Court had in mind. Their attributes—limited access and high-speed traffic, among others—make them unsuitable for service as public forums. Up to this point the dissent's reasoning is largely unassailable. What follows is not. The dissent then concludes, "Because freeways and government property within a freeway right-of-way, *such as freeway overpasses*, are not public forums," restrictions on speech are permissible if reasonable. (Dis. opn., *post*, at p. 890, italics added.) This segue (or, more appropriately, *giant leap)* from freeways to freeway overpasses is

unaccompanied by analysis of overpasses or any explanation as to why a freeway overpass—a public street that crosses over a freeway—should be treated the same as the freeway it crosses.

Only later does the dissent attempt to explain, and the explanation is totally unsatisfactory. Instead of the well-reasoned analysis of the function and characteristics of freeways supporting the dissent's conclusion that freeways are unsuitable public forums, the dissent offers a primer on property law: "The owner of land in fee has the right to the surface and to everything permanently situated beneath or above it." (Civ. Code, § 829.) The dissent is correct on this point of law but the point is meaningless. What matters is not who owns the overpass but the characteristics that make it an unsuitable public forum. No amount of legal sleight of hand can alter the simple fact that a freeway overpass is not a freeway.

The dissenting opinion's analysis of the CHP's authority is similarly flawed. Accusing the majority of placing the statutory cart before the constitutional horse, the dissent cites *Perry Ed. Assn. v. Perry Local Educators' Assn.* (1983) 460 U.S. 37, 44 [103 S.Ct. 948, 954, 74 L.Ed.2d 794, 804] for the proposition that the right of access will differ depending on the character of the property at issue. From this simple undisputed principle, the dissent concludes: "Accordingly, the initial, and pivotal, issue that must be resolved is whether freeways and freeway overpasses are public forum properties." (Dis. opn., *post*, at p. 879.) The dissent thus insists that we must address the constitutional issue before we address the statutory question of whether the CHP is even empowered to act. I fear the dissent not only has the horse and cart inverted, but the cart is also detached from the horse. The CHP's authority to act in the first instance is unrelated to the status of property as a public forum.

It is true that a lower standard is required of restrictions imposed on property that is not a public forum. "The state" has great authority to act in such an instance, but the CHP has not been ceded all of the state's powers. It is simply an agent of government with limited, statutorily defined authority to act. We have been pointed to no statute restricting the access of pedestrians to freeway overpasses. Thus, before delving into difficult constitutional questions, it is fair to first ask what gives the CHP the authority to act as it did. Had plaintiffs' demonstrators been removed from the freeway by employees of the Board of Fabric Care, we would inquire into that board's authority to act. We cannot simply presume the CHP has such authority.

Finally, I concur with my colleague that we are not compelled to reach the question of whether a freeway overpass is a public forum. Our opinion

makes clear that even assuming public forum rules apply, the facts in this case warrant the action taken by the CHP. The dissent complains that our opinion leaves prospective protestors to puzzle over the scope of the CHP's authority. That result, however, is inevitable unless we conclude, as does the dissent, that an overpass is not a public forum. We are neither a legislature nor an enforcement agency. Our task is to review restraints enacted by the Legislature and standards of enforcement promulgated by administrative agencies. Where, as here, the authority to act is premised on an expansive statute such as Vehicle Code section 2410, which empowers action on a case-by-case basis, our review must necessarily be limited to the facts of the particular case. The parties are not left bereft of guidance; similar facts will produce similar results.

**SCOTLAND, P. J.,** Dissenting.—As will soon become apparent, I strongly disagree with the majority's analysis—an analysis that should be terrifying to any person who drives on a freeway.

As the parties and the trial court recognized, this case poses a relatively straightforward question. Is a freeway overpass a public forum that demonstrators can use to communicate their message to freeway motorists passing below?

In declining to decide this question, the majority takes a wrong turn that in effect invites groups or individuals to demonstrate on freeway overpasses, leaving them and the California Highway Patrol with the burden of litigating over the use of freeway overpasses case by case, overpass by overpass, throughout the state—with the outcome depending on how much traffic congestion that a particular demonstration causes. In other words, the parties will be obligated to hit the road again, through future litigation, in an effort to obtain judicial answers to the questions they pose.

And the majority's decision will burden freeway motorists with the danger that its approach will create. After all, the purpose of demonstrating on a freeway overpass is to cause freeway motorists to take their eyes and attention off driving and to focus, instead, on the signs and photographs displayed by the demonstrators—and even to cause motorists to remain distracted as they ponder, rejoice, or fume about the message while driving on. Nevertheless, the majority suggests that authorities must wait and see whether traffic congestion and dangerous conditions actually develop.

I refuse to travel down this road since it is far too dangerous and because the majority's analysis is inconsistent with the law and common sense. Not only is the use of freeway overpasses for expressive activity inconsistent

with the purpose served by the overpasses, it takes no imagination to realize that such activity poses a grave threat to the safety and health of freeway drivers. Negotiating the freeways today is difficult enough due to the speeds reached by most drivers and the lack of skills displayed by many of them. With motorists distracted by demonstrators on the overpasses above, accidents are bound to result, some of them fatal. Thus, you could say the majority opinion is dead wrong.

This will be no small problem. As the record in this case shows, plaintiffs began using freeway overpasses because "it was a cheap and efficient economical way to get [their] message to as many people as possible." It is inevitable that other individuals or organizations will follow suit because, as I have noted, the majority essentially invites them to protest on freeway overpasses while the authorities wait to see what effect the protests have on traffic congestion and safety.

I shudder to think of the consequences that will prevail. For example, white supremacist skinheads may be able to use the 12th Avenue overpass on Highway 99 to protest against the Dr. Martin Luther King, Jr., holiday; just think how worked up and distracted this will get drivers who are speeding down the freeways, and how unsafe this will be for those on the road. Why not dueling overpasses—Bomb Saddam advocates on the Sunrise Boulevard overpass and No War in Iraq protestors on the Mather Field Road overpass on Highway 50? The possibilities are endless. The danger to motorists is clear.

Let there be no doubt that my views on the issue are not influenced by the nature of the protest in this case. Whatever the message, allowing it to be delivered by demonstrators on a freeway overpass to traffic below presents too great a danger of physical harm to motorists.

As I will explain in detail to follow, freeway overpasses are not public forums in which to engage in expression protected by the First Amendment. Hence, the California Highway Patrol can prohibit the expression of ideas on freeway overpasses provided, as occurred in this case, that its actions are reasonable and not intended to suppress any particular point of view. If I am wrong and the law allows freeway overpasses to be used by demonstrators as public forums, then to borrow some words from Charles Dickens, "the law is a ass—a idiot." (Dickens, Oliver Twist (1838) ch. 51 (Bumble).)

I

I begin by demonstrating why the majority's end run around the public forum question is wrong.

As noted earlier, the positions of the parties in this case are relatively straightforward. Plaintiffs want to use freeway overpasses to communicate to motorists passing underneath the overpasses. Plaintiffs contend that freeway overpasses are public forums, and that they have a constitutional right to use them for communicative purposes subject only to "a reasonable time, place, manner restriction narrowly drawn to meet a significant state interest." On past occasions, defendant California Highway Patrol (CHP) has prevented plaintiffs from using freeway overpasses to demonstrate to freeway drivers. On those occasions, plaintiffs were trying to demonstrate during periods of rush hour traffic. However, plaintiffs did not, either by pleading or by testimony, limit their request for relief to such periods.

The CHP, on the other hand, asserts that freeways and freeway overpasses are not public forums. At trial, the CHP presented clear and forceful testimony that it enforces a blanket policy of prohibiting demonstrations from freeway overpasses whenever and wherever they occur, regardless of the content of the message. The witnesses explained that such demonstrations inevitably have an adverse effect on the safe and efficient movement of freeway traffic. Thus, it is clear that, unless restrained by judicial decision, the CHP will not permit plaintiffs to demonstrate from freeway overpasses at any time.

In light of this continuing dispute, plaintiffs brought this action for (1) an injunction prohibiting the CHP "from denying plaintiffs' constitutional right to express their views in a traditional public forum," and (2) "[f]or a declaration by the court of the rights and duties of plaintiff[s] herein." During preparation for trial, opposing counsel "had conversations over the last several months about trying to get as clean and clear a constitutional outcome from this proceeding as possible." To that end, the parties endeavored to eliminate extraneous and undisputed issues by stipulation.

The parties recognize that the initial, and pivotal, issue is whether freeways and freeway overpasses are public forum properties. If so, plaintiffs' conduct cannot be prohibited, but may be regulated by a specific and narrowly drawn time, place, and manner regulation. (*Perry Ed. Assn. v. Perry Local Educators' Assn.* (1983) 460 U.S. 37, 45 [103 S.Ct. 948, 954-955, 74 L.Ed.2d 794, 804].)[1] In that respect, plaintiffs asked the CHP for statutory authority relevant to such conduct. The CHP provided a list of provisions,

---

[1] In addition to enforcing time, place, and manner regulations, the government can entirely exclude a particular speaker from a public forum if the exclusion is necessary to serve a compelling government interest and the exclusion is narrowly drawn to serve that end. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 45 [103 S.Ct. at pp. 954-955,

including Vehicle Code sections 2410, 21465, and 21467. (Further section references are to the Vehicle Code unless otherwise specified.) Sections 21465 and 21467 were identified as the primary provisions of significance.

The majority, seizing upon the trial discussions involving statutory provisions, seeks to avoid resolving the constitutional questions presented by focusing upon statutory issues. Such an approach does not work. By adopting it, the majority fails to resolve the parties' controversy and inevitably requires them to renew their litigative efforts.

The majority first construes sections 21465 and 21467 in a manner that excludes plaintiffs' conduct. Having done so, the majority concludes that plaintiffs are entitled to declaratory relief stating the CHP cannot rely upon those sections to exclude plaintiffs from freeway overpasses.

The majority's approach places the statutory cart before the constitutional horse. As the United States Supreme Court said in *Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. 37 [103 S.Ct. 948, 74 L.Ed.2d 794]: "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." (*Id.* at p. 44 [103 S.Ct. at p. 954, 74 L.Ed.2d at p. 804].) Accordingly, the initial, and pivotal, issue that must be resolved is whether freeways and freeway overpasses are public forum properties.

In order to show cause for relief, plaintiffs must establish that they have an affirmative right to demonstrate to freeway traffic from freeway overpasses. Plaintiffs cannot establish an affirmative right simply by showing that some particular statute does not apply to them. Rather, the issue necessarily turns on whether freeways and freeway overpasses are public forums. (See *Arkansas Ed. Television Comm'n v. Forbes* (1998) 523 U.S. 666, 677-680 [118 S.Ct. 1633, 1641-1643, 140 L.Ed.2d 875, 886-889].) If freeways and freeway overpasses are not public forums, plaintiffs have no constitutional right to demonstrate from them and may be prohibited from doing so provided that their exclusion is not based on their viewpoint and is reasonable in light of the purposes for which the property is maintained. (*Id.* at p. 682 [118 S.Ct. at pp. 1643-1644, 140 L.Ed.2d at pp. 889-890].) In such case, the existence of a specific statutory exclusion is not critical. (See, e.g., *Arkansas Ed. Television Comm'n v. Forbes, supra,* at pp. 682-683 [118 S.Ct. at pp. 1643-1644, 140 L.Ed.2d at pp. 889-890] [exclusion based upon

---

74 L.Ed.2d at p. 804].) However, no one in this litigation has suggested that any content-based distinction may be applied to plaintiffs.

"journalistic discretion"].) If, on the other hand, freeways and freeway overpasses are public forums, plaintiffs may not be entirely prohibited from demonstrating, and may be regulated only by specific and narrowly drawn statutes or regulations. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 45 [103 S.Ct. at pp. 954-955, 74 L.Ed.2d at p. 804].) In such case, sections 21465 and 21467, which are broad, blanket prohibitions, cannot suffice. In either case, an interpretation of those sections is not determinative of the issues presented.

In any event, the majority presupposes that the removal authority granted by section 21467 is necessarily limited to the prohibitions of section 21465. However, section 21467 authorizes summary removal of "[e]very prohibited sign, signal, device, or light." Section 21465 is not the sole source of prohibition against signs, signals, devices or lights. (See, e.g., Bus. & Prof. Code, §§ 5403, 5405.3.) A statutory provision cannot be read in isolation, but must be construed together with other laws on the same subject matter. (*California Real Estate Loans, Inc. v. Wallace* (1993) 18 Cal.App.4th 1575, 1582 [23 Cal.Rptr.2d 462].)

Thus, to warrant relief precluding the CHP from exercising authority under section 21467, it is not enough to conclude that section 21465 does not apply to plaintiff's conduct; rather, it must be demonstrated that plaintiffs have a right to engage in the challenged activity. In the circumstances of this case, that can be addressed only by resolving whether or not freeways and freeway overpasses are public forums.

The majority next proceeds to a discussion of section 2410 and concludes that this provision permits the CHP to prohibit plaintiffs' activities, at least in some circumstances. Based on this conclusion, the majority further concludes that it is unnecessary to determine whether freeways and freeway overpasses are public forums. Again, the approach does not work.

First, as I have pointed out, the discussion places the statutory cart before the constitutional horse. We cannot know the standard by which to evaluate limitations upon plaintiffs' expressive efforts until we have first determined the character of the property at issue. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 44 [103 S.Ct. at p. 954, 74 L.Ed.2d at p. 804].)

Second, the majority's decision fails to answer numerous questions that are essential to the parties' understanding of their rights and responsibilities. Thus, the opinion states that the CHP may prohibit plaintiffs' demonstrations in order to ensure the free flow of traffic or to avoid traffic congestion, but

leaves unanswered such questions as: Can section 2410 be applied as a preventative measure to avoid traffic congestion before it occurs? Since the CHP witnesses testified that expressive conduct on the freeways inevitably impedes the free flow of traffic, can the CHP exclude demonstrations in their entirety, thus effectively closing the forum if it was otherwise open? If traffic congestion is prerequisite to the application of section 2410, by what criteria is traffic congestion to be determined? Is it enough that traffic is congested or must plaintiffs' conduct contribute to it? Whose opinion is determinative? What recourse do plaintiffs have if they disagree?

Precision is the touchstone of First Amendment jurisprudence; but the majority opinion effectively leaves the parties where they were before this litigation, without guidance to enable them to avoid future controversy, and future litigation.

Third, the majority's approach imposes unwarranted limitations upon the issues presented by the parties. It is true that when the CHP interfered with plaintiffs' activities in the past, plaintiffs were demonstrating during rush hours. However, plaintiffs did not suggest that they would limit their desire to demonstrate to rush hours. Rather, they plan to demonstrate from freeway overpasses "if we've essentially a clear legal route to do so."

It is also true that, on prior occasions, officers were sent to the scene as the result of citizen complaints. But at trial, the officers made it clear that they did not exclude plaintiffs from the overpasses as the result of individualized consideration, but simply applied a blanket rule of exclusion. Officer Peart, who was involved in the prior incidents, testified that he would exclude demonstrators from overpasses whenever they come to his attention. Sergeant Faria, who was also involved in the prior incidents, concurred. Neither officer attempted to describe the traffic conditions at the time of the prior encounters, and neither officer tried to justify their actions by reference to particular traffic conditions.

Plaintiffs were not cited or arrested as a result of the prior incidents. They do not seek to avoid prosecution, fine, or other onus arising from those events. They do not seek recompense from the CHP based upon those events. In the trial court, evidence related to the prior events was presented solely to establish that an actual legal controversy has arisen between the parties. The legal controversy is whether plaintiffs can be prohibited entirely from demonstrating to freeway traffic from freeway overpasses. The majority's singular focus on the prior incidents does little to resolve the actual controversy that exists.

Finally, by its decision the majority assumes the role of fact finder. Since the parties were interested in resolving their dispute to avoid future controversy, they did not actually litigate the question whether, in past incidents, particular circumstances existed that would warrant restriction on plaintiff's conduct, if such conduct were otherwise permissible. The trial court did not decide that question. However, if plaintiffs have a right to demonstrate from freeway overpasses subject to restriction under some circumstances, the question whether those circumstances exist is in large part factual. Since the parties did not litigate that issue, and the trial court did not decide it, this court is not in a position to determine whether, in the prior incidents, circumstances warranted application of section 2410.

The most the majority could properly conclude is plaintiffs may be prohibited from demonstrating from freeway overpasses when the circumstances described in section 2410 are present. But the negative pregnant included in such a declaration—that plaintiffs are otherwise entitled to demonstrate—is not a conclusion that we can properly reach without specifically addressing the question whether freeway overpasses are public forums.

An appellate court cannot adjudicate through the mechanism of a negative pregnant. Rather, a decision of an appellate court must be supported by a written statement of reasons. (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1267 [48 Cal.Rptr.2d 12, 906 P.2d 1112].) And decisions "are not authority for propositions not considered." (*McDowell & Craig v. City of Santa Fe Springs* (1960) 54 Cal.2d 33, 38 [4 Cal.Rptr. 176, 351 P.2d 344].) This is particularly true where the appellate court specifically declines to address an issue. (*Estate of Baird* (1924) 193 Cal. 225, 239 [223 P. 974]; *Estate of Hall* (1908) 154 Cal. 527, 531 [98 P. 269].)

Thus, while a casual reading of the majority opinion might suggest that the plaintiffs must be permitted to demonstrate from freeway overpasses at some times, such an unconsidered implication is not binding on the parties (*Pacific Estates, Inc. v. Superior Court* (1993) 13 Cal.App.4th 1561, 1576 [17 Cal.Rptr.2d 434]), or the trial court (*People v. Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211]), and cannot serve as precedent for purposes of stare decisis (*People v. Superior Court (Williams)* (1992) 8 Cal.App.4th 688, 703 [10 Cal.Rptr.2d 873]).

The only appropriate conclusion that can be drawn from the majority opinion is the CHP may be able to continue to prohibit plaintiffs from demonstrating, so long as it does not purport to rely upon sections 21465 and

21467 in doing so. If plaintiffs desire a judicial determination whether they have a right to demonstrate in at least some circumstances, they will be obliged to commence new litigation.

The majority notes the general rule, founded in the principle of judicial restraint, that we will avoid deciding constitutional questions unless doing so is strictly necessary to resolution of the case before us. The rule is well established. (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230-231 [45 Cal.Rptr.2d 207, 902 P.2d 225].) But it is equally well established that the rule cannot be applied rigidly where First Amendment interests are at stake and lengthy, piecemeal litigation, that may not fully vindicate those interests, must be avoided. (*Baggett v. Bullitt* (1964) 377 U.S. 360, 378-379 [84 S.Ct. 1316, 1326-1327, 12 L.Ed.2d 377, 389]; *People v. Fogelson* (1978) 21 Cal.3d 158, 163 [145 Cal.Rptr. 542, 577 P.2d 677].) Moreover, when a constitutional question is squarely presented in a justiciable controversy, it becomes our responsibility to resolve it. (See *Heckler v. Mathews* (1984) 465 U.S. 728, 739-740 [104 S.Ct. 1387, 1395-1396, 79 L.Ed.2d 646, 657]; *Times Film Corp. v. Chicago* (1961) 365 U.S. 43, 44-46 [81 S.Ct. 391, 392-393, 5 L.Ed.2d 403, 405].)

The CHP has made it clear that, unless it is advised it may not do so, it will preclude plaintiffs from demonstrating from freeway overpasses at any time and under any circumstances. A justiciable controversy has been presented by the parties that requires our determination, through a public forum analysis, whether plaintiffs have a constitutional right to demonstrate from freeway overpasses. (See *California Comm'n v. United States* (1958) 355 U.S. 534, 540 [78 S.Ct. 446, 450-451, 2 L.Ed.2d 470, 475].) We cannot fully and properly resolve the controversy presented without first resolving this question.

Because I have been unable to convince the majority to address the pivotal constitutional question presented in this litigation, I set forth my own views of the matter.

II

As the parties recognize, the degree to which the government can restrict a person from using public property to express the person's views depends on the character of the property. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra*, 460 U.S. at p. 44 [103 S.Ct. at p. 954, 74 L.Ed.2d at p. 804].) Therefore, they agree that the important first step in considering the issue

tendered in this case is a "forum analysis," although they predictably harbor differing perceptions in that regard.[2]

For purposes of a forum analysis, public property may be classified into three broad categories. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at pp. 45-46 [103 S.Ct. at pp. 954-956, 74 L.Ed.2d at pp. 804-805].)

The first category includes places that are quintessential public forums, i.e., "which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' [Citation.]" (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 45 [103 S.Ct. at pp. 954-955, 74 L.Ed.2d at p. 804].) "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed." (*Ibid.*) The government may enforce content-neutral time, place, and manner regulations that are narrowly tailored to serve a significant government interest and that leave open ample alternative channels of communication. (*Ibid.*) The government also may enforce a content-based exclusion if it is necessary to serve a compelling state interest and it is narrowly drawn to serve that interest. (*Ibid.*; accord, *International Soc. for Krishna Consciousness, Inc. v. Lee* (1992) 505 U.S. 672, 678 [112 S.Ct. 2701, 2705, 120 L.Ed.2d 541, 550].)

The second category of public property is that which is not a traditional public forum but which the government has opened for use by the public as a place for expressive activity. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 45 [103 S.Ct. at pp. 954-955, 74 L.Ed.2d at p. 805].) To be a public forum by "designation" (*ibid.*), it is not enough that

[2]Plaintiffs claim the First Amendment of the United States Constitution *and* article I, section 2 of our state Constitution preclude interference with their demonstrations. However, plaintiffs offer no argument or analysis as to why a forum analysis under the California Constitution should be applied differently than is such an analysis under the First Amendment. In fact, except for several brief and conclusory references to our state Constitution, plaintiffs' entire argument is predicated on a First Amendment analysis. Thus, they end their briefing by arguing: "Defendants acted without legal authority when they decided to interfere with plaintiffs' First Amendment activities, and this court should reverse the trial court, and order it to enjoin defendant from any further infringement on plaintiffs' First Amendment activities."

Under the circumstances, plaintiffs have waived any claim that our state Constitution provides them with greater rights than does the First Amendment in the context of the nature of their expressive activity in this case. (*Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].)

the property be open to some forms of communication, or even that it be maintained for the purpose of communicative activity. (*Id.* at pp. 46-47 [103 S.Ct. at pp. 955-956, 74 L.Ed.2d at pp. 805-806]; *U.S. Postal Service v. Greenburgh Civic Assns.* (1981) 453 U.S. 114, 129, fn. 6 [101 S.Ct. 2676, 2685, 69 L.Ed.2d 517, 530].) Rather, it must appear that the government has intentionally opened the property for expressive activity by the general public. (*Arkansas Ed. Television Comm'n v. Forbes, supra,* 523 U.S. at p. 677 [118 S.Ct. at p. 1641, 140 L.Ed.2d at p. 886].) While the government is not required to retain the open character of such property indefinitely, as long as it does so it is bound by the same rules that apply to traditional public forums, i.e., "[r]easonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 46 [103 S.Ct. at p. 955, 74 L.Ed.2d at p. 805]; accord, *International Soc. for Krishna Consciousness, Inc. v. Lee, supra,* 505 U.S. at p. 678 [112 S.Ct. at p. 2705, 120 L.Ed.2d at p. 550].)

The third category of public property is that which is neither by tradition nor by designation an open forum for general public communication. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 46 [103 S.Ct. at pp. 955-956, 74 L.Ed.2d at p. 805].) "[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." (*U.S. Postal Service v. Greenburgh Civic Assns., supra,* 453 U.S. at p. 129 [101 S.Ct. at p. 2685, 69 L.Ed.2d at p. 530].) With respect to public property that is not an open forum for public communication, the government may enforce time, place, and manner regulations, and also "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 46 [103 S.Ct. at p. 955, 74 L.Ed.2d at p. 805]; accord, *International Soc. for Krishna Consciousness, Inc. v. Lee, supra,* 505 U.S. at pp. 678-679 [112 S.Ct. at pp. 2705-2706, 120 L.Ed.2d at p. 550].)[3]

Here, the public properties at issue are freeway overpasses upon which plaintiffs desire to direct their demonstrations to freeway motorists below. In

---

[3]Public property that is not by tradition or by designation a public forum may be a nonpublic forum or not a forum at all. (*Arkansas Ed. Television Comm'n v. Forbes, supra,* 523 U.S. at pp. 677-678 [118 S.Ct. at pp. 1641-1642, 140 L.Ed.2d at p. 887].) A nonpublic forum arises where public property is used for communication but is not open to the general public for communicative purposes. (*Ibid.*) In either case, the government can restrict the use of the property to its intended purposes so long as the government acts reasonably and not merely to suppress particular points of view. (*Ibid.*)

other words, plaintiffs seek to use public property directly over the roadway and thus within the freeway right-of-way. (Civ. Code, § 829; see *Irwin v. City of Manhattan Beach* (1966) 65 Cal.2d 13, 22 [51 Cal.Rptr. 881, 415 P.2d 769].)

Noting that public streets are considered to be quintessential public forums (*Perry Ed. Assn. v. Perry Local. Educators' Assn., supra*, 460 U.S. at p. 45 [103 S.Ct. at pp. 954-955, 74 L.Ed.2d at p. 804]), plaintiffs argue that so too must be freeways. I disagree for reasons that follow.

"Strictly speaking, a 'street' is a public thoroughfare in an urban community such as a city, town, or village, and the term is not ordinarily applicable to roads and highways outside of municipalities." (39 Am.Jur.2d (1999) Highways, Streets, and Bridges, § 8, p. 588, fn. omitted; see also Black's Law Dict. (7th ed. 1999) p. 1435.) In other words, "[a]ll streets are highways, but not all highways are streets." (*Montgomery v. Railway Company* (1894) 104 Cal. 186, 188 [37 P. 786].)

In the ordinary and conventional sense, a street is a means of intercommunication among members of the public for travel; for the conduct of personal, social, and economic intercourse; and for the convenient use of abutting properties, both commercial and residential. (See *Hague v. C.I.O.* (1939) 307 U.S. 496, 515-516 [59 S.Ct. 954, 963-964, 83 L.Ed. 1423, 1436-1437].) Thus, in the conventional sense, streets are built and maintained to serve the public as well as abutting property owners. (*Schnider v. State of California* (1952) 38 Cal.2d 439, 443 [241 P.2d 1, 43 A.L.R.2d 1068]; *People ex rel. Dept. of Transportation v. Wilson* (1994) 25 Cal.App.4th 977, 982 [31 Cal.Rptr.2d 52].) Members of the public traveling upon a street may stop and visit an abutting property, for business or personal purposes, and then reenter the street. (*People ex rel. Dept. of Transportation v. Wilson, supra*, 25 Cal.App.4th at p. 982.) And abutting property owners have a right of access to the street, which includes a right to be seen and visited by members of the public. (*Schnider v. State of California, supra*, 38 Cal.2d at p. 443; *People ex rel. Dept. of Transportation v. Wilson, supra*, 25 Cal.App.4th at p. 982.)

Traditional public forums, such as streets, "are open for expressive activity regardless of the government's intent" because "[t]he objective characteristics of these properties require the government to accommodate public speakers." (*Arkansas Ed. Television Comm'n v. Forbes, supra*, 523 U.S. at p. 678 [118 S.Ct. at p. 1641, 140 L.Ed.2d at p. 887].) In places where the general public can gather, visit, and talk, they inevitably will do so, and it

would be impossible and wholly unreasonable for the government to attempt to prescribe expressive activity in such places. Public streets, in their ordinary and conventional sense, are precisely the type of public property that falls within the concept of a public forum.

Freeways, however, differ greatly from streets. Although streets, in their conventional sense, immemorially have been used as public forums (*Hague v. C.I.O., supra*, 307 U.S. at p. 515 [59 S.Ct. at pp. 963-964, 83 L.Ed. at p. 1436]), freeways are of relatively recent origin. They were created to further the development of the state with an increasingly motorized, commuter public. (See Sts. & Hy. Code, § 250.) Unlike conventional streets, freeways serve a limited and restricted purpose; they "are designed to provide rapid transit for through traffic, uninterrupted by vehicles or pedestrians from private roads and intersecting streets . . . ." (*Schnider v. State of California, supra*, 38 Cal.2d at p. 442.)

"It is the very essence of the idea of a freeway to prevent just [the] sort of thing [that a conventional street is maintained to serve]." (*People ex rel. Dept. Public Works v. Lipari* (1963) 213 Cal.App.2d 485, 491 [28 Cal.Rptr. 808].) Thus, the purpose and intent in the creation of a freeway are just the opposite of the purpose and intent in the creation and maintenance of an ordinary street or road. (*People ex rel. Dept. of Transportation v. Wilson, supra*, 25 Cal.App.4th at p. 982.)

In order for freeways to serve their limited purpose, they are subject to rules that are unlike those applicable to ordinary streets and roads. They are not open to the general public; rather, use is restricted to persons in motor vehicles who desire and are willing to travel in a rapid and uninterrupted manner from one place to another. (*Schnider v. State of California, supra*, 38 Cal.2d at p. 442.) Abutting landowners have no, or at best limited, rights of access. (*Ibid.*; *People ex rel. Dept. of Transportation v. Wilson, supra*, 25 Cal.App.4th at p. 982.) Pedestrians, bicyclists, and other relatively slow modes of transportation generally are prohibited. (§ 21960.) Motorists can enter or leave the freeway only at designated on and off ramps. (§ 21664.) They cannot stop (§ 21718) or make a turn (§ 21651). Freeways often are posted with minimum as well as maximum speed limits. (§ 22400, subd. (b).) And the Legislature has provided that no person may solicit, display, sell, offer for sale, or otherwise vend or attempt to vend any merchandise or service while being wholly or partly within the right-of-way of any freeway, including any on-ramp, off-ramp, or roadway shoulder that lies within the freeway right-of-way. (§ 22520.5, subd. (a).)

Consistent with the legislative intent of maintaining freeways for the purpose of providing uninterrupted rapid transit for through traffic, the

Legislature has expressly delineated the types of signs or markers that California's Department of Transportation (Caltrans) can place, maintain, or authorize along the freeway rights-of-way. The types of signs or markers within the authority of Caltrans are those reasonably necessary or convenient for purposes of rapid transit. For example, Caltrans can maintain certain directional signs. (Sts. & Hy. Code, § 100.9 [directions to a city or business district]; Sts. & Hy. Code, §§ 101, 123.5 [historical sites]; Sts. & Hy. Code, § 131.5 [governmental maintained roadside rest areas]; § 21375 [institutions of postsecondary education].) In rural areas, it can maintain signs advising motorists of the fuel, food, lodging, or camping services that can be obtained at the next exit (Sts. & Hy. Code, § 101.7), or of the location of a fire station (Sts. & Hy. Code, § 101.9). And, of course, it can place, maintain, or cause to be placed or maintained appropriate and necessary signs, signals, and other traffic control devices. (§ 21350.) Other than the signs or markers the Legislature has specifically authorized, Caltrans has been given no general authority to place, maintain, or approve communicative activities within the freeway rights-of-way.[4]

It is these attributes that distinguish freeways from the type of ordinary or conventional streets which traditionally have been used as public forums. These attributes also make it impossible for a freeway to serve the usual purposes for which public forums exist, such as assembly, public discussion and debate, and the communication of thoughts among members of the public. (*Hague v. C.I.O., supra*, 307 U.S. at p. 515 [59 S.Ct. at pp. 963-964, 83 L.Ed. at p. 1436].) There simply cannot be free and open assembly, public debate, or an exchange of ideas in a location where pedestrians are forbidden, motorists cannot stop, and traffic passes at relatively high speeds.

The United States Supreme Court "has rejected the view that traditional public forum status extends beyond its historic confines . . . ." (*Arkansas Ed. Television Comm'n v. Forbes, supra*, 523 U.S. at p. 678 [118 S.Ct. at p. 1641, 140 L.Ed.2d at p. 887].) Rather, the development of new methods of transportation requires the development of new methods of accommodating that transportation, and each new step requires a new inquiry into the compatibility of transportation necessities and various kinds of expressive

---

[4]In the Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.), the Legislature stated an intent to occupy the whole field of regulation of outdoor advertising adjacent to interstate or primary highways. (Bus. & Prof. Code, §§ 5226-5227.) Caltrans has authority to enforce provisions of the act. (Bus. & Prof. Code, § 5250.) In general, whether advertising may be permitted, and the nature thereof, depend upon things like the type of highway involved, the character of the surrounding area, and the proximity of the advertising to the highway. However, no advertising display can be placed or maintained within the right-of-way of any highway. (Bus. & Prof. Code, § 5403, subd. (a).)

activity. (*International Soc. for Krishna Consciousness, Inc. v. Lee, supra,* 505 U.S. at p. 681 [112 S.Ct. at pp. 2706-2707, 120 L.Ed.2d at p. 552].) While I understand plaintiffs' desire to direct their communication to freeway motorists (freeways provide an essentially captive audience with a relatively high volume of viewers), the efficiency of the medium does not dictate that the property be treated as a public forum. (*U.S. Postal Service v. Greenburgh Civic Assns., supra,* 453 U.S. at p. 129 [101 S.Ct. at p. 2685, 69 L.Ed.2d at pp. 529-530].)

Accordingly, I am compelled to conclude that freeways, which serve a limited purpose wholly opposite that of ordinary streets, are not public forums. In reaching this conclusion, I am mindful of the United States Supreme Court's decision in *Frisby v. Schultz* (1988) 487 U.S. 474 [108 S.Ct. 2495, 101 L.Ed.2d 420], which addressed a city's adoption of an ordinance that completely banned picketing before or about any residence. The city asserted that its streets should not be considered public forums due to their physical narrowness and residential character. (*Id.* at p. 480 [108 S.Ct. at p. 2500, 101 L.Ed.2d at p. 429].) The Supreme Court disagreed: "No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora." (*Id.* at p. 481 [108 S.Ct. at p. 2500, 101 L.Ed.2d at p. 429].)[5] However, *Frisby v. Schultz* would compel a conclusion favorable to plaintiffs' position only if this court were to extend the holding beyond the usual and ordinary meaning of "street" and find its reasoning applicable to any government property dedicated to some form of travel, regardless how limited or restricted. We are not at liberty to do so, as I will explain.

"First Amendment rights must always be applied 'in light of the special characteristics of the . . . environment' in the particular case. [Citation.]" (*Healy v. James* (1972) 408 U.S. 169, 180 [92 S.Ct. 2338, 2345, 33 L.Ed.2d 266, 279].) It is not travel per se that makes a street a public forum; rather, it is the street's inherent capacity and traditional use for purposes of assembly, discussion, and other forms of social, economic, and political intercourse. (Compare *Hague v. C.I.O., supra,* 307 U.S. at p. 515 [59 S.Ct. at pp. 963-964, 83 L.Ed. at p. 1436], with *International Soc. for Krishna Consciousness, Inc. v. Lee, supra,* 505 U.S. at p. 681 [112 S.Ct. at pp. 2706-2707, 120 L.Ed.2d at p. 552].)

Freeways, unlike ordinary streets, are ill-suited to serve those purposes of public forums and, in their relatively brief history, freeways have not been held open for such purposes.

---

[5]Although the Supreme Court concluded the city's residential streets are public forums, it went on to uphold the ordinance against facial challenge as being a reasonable time, place, and manner regulation. (*Frisby v. Schultz, supra,* 487 U.S. at p. 488 [108 S.Ct. at p. 2504, 101 L.Ed.2d at p. 434].)

In this respect, I find the decision in *Greer v. Spock* (1976) 424 U.S. 828 [96 S.Ct. 1211, 47 L.Ed.2d 505] to be significant. It involved the Fort Dix Military Reservation, which contained roads and footpaths open to civilian use. Civilians were permitted to visit any unrestricted area of the reservation, but expressive activities, such as demonstrations, picketing, marches, and political speeches, were prohibited. (*Id.* at pp. 830-831 [96 S.Ct. at pp. 1213-1214, 47 L.Ed.2d at pp. 509-510].) In rejecting a First Amendment challenge to the prohibition upon expressive activities, the Supreme Court distinguished the roads and footpaths on the military reservation from "a municipality's open streets, sidewalks, and parks" and concluded the open roads and footpaths on the military reservation were not public forums. (*Id.* at pp. 835, 838 [96 S.Ct. at p. 1216, 1217-1218, 47 L.Ed.2d at pp. 512-513, 514].) In reaching this conclusion, the court noted that the business of a military reservation is "to train soldiers, not to provide a public forum." (*Id.* at p. 838 [96 S.Ct. at p. 1217, 47 L.Ed.2d at p. 514].)

The decision in *Greer v. Spock, supra,* 424 U.S. 828 [96 S.Ct. 1211, 47 L.Ed.2d 505] demonstrates that when the United States Supreme Court speaks of streets as traditional public forums, it uses the word "street" in the ordinary and conventional sense, i.e., in reference to the public streets of a municipality. The court does not necessarily extend the meaning of "street," and hence the status of public forum, to every pathway of travel in the public domain. This is consistent with the court's statement that while a public forum analysis generally provides a workable analytical tool, the distinctions may blur at the edges, particularly "in cases falling between the paradigms of government property interests essentially mirroring analogous private interests and those clearly held in trust, either by tradition or recent convention, for the use of citizens at large." (*City Council v. Taxpayers for Vincent* (1984) 466 U.S. 789, 815, fn. 32 [104 S.Ct. 2118, 2134, 80 L.Ed.2d 772, 794].) It also is consistent with the court's view that First Amendment rights must always be applied in light of the environment in the particular case. (*Healy v. James, supra,* 408 U.S. at p. 180 [92 S.Ct. at pp. 2345-2346, 33 L.Ed.2d at p. 279].)

Freeways are not streets in the ordinary and conventional use of the word "street" and, with their limited purpose and restricted use, freeways have not been held in trust for the general use of the public at large.[6]

Because freeways and government property within a freeway right-of-way, such as freeway overpasses, are not public forums, the government

---

[6]For the general purposes of California's Vehicle Code, "street" and "highway" are synonymous and are broadly defined to include every pathway publicly maintained and open to the use of the public for purposes of vehicular travel. (§§ 360, 590.) Although this definition of "street" is broad enough to include, freeways, I am not here considering an interpretation or construction of our Vehicle Code. Rather, I am applying the precedent of the

may reserve them for their "intended purposes" as long as the restriction on speech is reasonable and not an effort to suppress views with which public officials disagree. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 46 [103 S.Ct. at pp. 955-956, 74 L.Ed.2d at p. 805].)

At trial, the CHP relied upon two bases for prohibiting expressive activity on freeway overpasses—efficiency and safety. I find these bases to be reasonable.

Evidence in the record shows that plaintiffs purposely timed their demonstrations for periods of heaviest freeway use, so-called rush hours. While plaintiffs did so in order to reach the greatest number of drivers, those also are times that involve the greatest potential for disruption of the efficient flow of traffic and the greatest danger to motorists from driver distraction.

The CHP presented testimony that any form of visual distraction on the freeways impedes the smooth flow of traffic, particularly during periods of high use or congestion. Accordingly, during commute times, the CHP employs a tow truck service to remove stalled vehicles as soon as possible; and officers even avoid making enforcement stops to prevent deleterious effects on traffic flow. Likewise, it is obvious that the efficient movement of traffic would be adversely affected by expressive demonstrations aimed at freeway drivers.

The governmental concern for efficiency is well founded. Our increasingly congested freeways have caused the Legislature to take steps to promote efficiency, including, among other things, the placement of call boxes to enable motorists in need of aid to obtain assistance (Sts. & Hy. Code, § 2550), and the permanent implementation of a freeway service patrol system on traffic-congested urban freeways. (Sts. & Hy. Code, § 2560 et seq.) Distractions that can inhibit the smooth flow of traffic are matters of legitimate governmental concern since such distractions can hamper the ability of freeways to serve the purpose for which they are built and maintained.

Even more important is the adverse effect on public safety that expressive demonstrations would entail. In the high-speed, high-volume flow of traffic on a freeway, it is particularly important that drivers pay attention to driving. The specific purpose of an expressive demonstration aimed at freeway

---

United States Supreme Court. In declaring "streets" to be public forums, that court did not have in mind California's Vehicle Code or definitions therein. Consequently, the Vehicle Code does not operate to expand applicable Supreme Court precedent beyond its intended reach.

motorists is to gain their attention to a message, and thus distract them from their driving. In the high-speed, high-volume traffic flow of a freeway, a distracted driver is a significant safety hazard.

It cannot be denied that traffic safety is a legitimate governmental concern. In upholding a ban on advertising on vehicles using the streets of New York City, the United States Supreme Court said that it was within the discretion of the city to conclude that such advertising "constitutes a distraction to vehicle drivers and to pedestrians alike and therefore affects the safety of the public in the use of the streets." (*Railway Express v. New York* (1948) 336 U.S. 106, 109 [69 S.Ct. 463, 465, 93 L.Ed. 533, 538].) And in upholding a local ordinance declaring to be a nuisance any advertising sign adjacent to a freeway and designed to be viewed by freeway travelers, the California Supreme Court said the ordinance served "the obvious purposes of promoting highway safety as well as enhancing community aesthetic values." (*City of Escondido v. Desert Outdoor Advertising, Inc.* (1973) 8 Cal.3d 785, 790 [106 Cal.Rptr. 172, 505 P.2d 1012], disapproved on another point in *San Diego Bldg. Contractors Assn. v. City Council* (1974) 13 Cal.3d 205, 216 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973].)

Testimony introduced by the CHP established that its ban on expressive activity on freeways is applied in an across-the-board manner without regard to content. There is no basis in the record to dispute that the prohibition in this case was not an attempt to suppress any particular point of view. I am aware of anecdotal information, outside the record of this appeal, that action has not been taken in some areas to remove patriotic symbols and messages posted on freeway overpasses following the despicable terrorist attacks on September 11, 2001. However, there is no evidentiary basis in this case to conclude that the CHP's action against plaintiffs was taken to suppress their particular point of view or that the CHP employs its ban on expressive activity on freeways in a manner so as to suppress any particular points of view.

Because the governmental interests of efficiency and traffic safety are reasonable grounds for excluding expressive activities from freeway rights-of-way, and there is no basis in the record of this case to establish that the CHP employs its policy in a manner to suppress particular points of view, plaintiffs can be prevented from demonstrating on freeway overpasses.

III

Plaintiffs nevertheless suggest that they must be permitted to demonstrate to freeway traffic from freeway overpasses because, in doing so, they are not required to stand on the surface of the freeway itself. The argument fails.

Civil Code section 829 provides: "The owner of land in fee has the right to the surface and to everything permanently situated beneath or above it." This is consistent with Civil Code section 659, which states: "Land is the material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock, or other substance, and includes free or occupied space for an indefinite distance upwards as well as downwards, subject to limitations upon the use of airspace imposed, and rights in the use of airspace granted, by law."

Specific to state highways, Streets and Highway Code section 660 provides: "(a) [The term] '[h]ighway' includes all, or any part, of the entire width of the right-of-way of a state highway, whether or not the entire area is actually used for highway purposes. [¶] (b) [The term] '[e]ncroachment' includes any tower, pole, pole line, pipe, pipe line, fence, billboard, stand or building, or any structure, object of any kind or character not particularly mentioned in this section, or special event, which is [placed] in, under, or over any portion of the highway."

These statutes reflect the general rule that a property owner has the right to the enjoyment and control of the airspace above the property that is reasonably adaptable to the beneficial use of the property. (*Strother v. Pacific Gas & Elec. Co.* (1949) 94 Cal.App.2d 525, 537 [211 P.2d 624].) This rule was a fundamental premise of the litigation in *Irwin v. City of Manhattan Beach, supra,* 65 Cal.2d 13, a decision that held a municipality could properly authorize the construction of a pedestrian walkway over a city street, and "could limit the use of the structure in any reasonable manner, including its withdrawal from the access of the public at large." (*Id.* at p. 22.)

Freeway overpasses serve the dual interests of the state and of the surrounding community. Overpasses serve the interest of the state by enabling it to maintain freeways as a means of rapid, uninterrupted transit for through traffic. (*Schnider v. State of California, supra,* 38 Cal.2d at p. 442.) And they serve the interest of the surrounding community by preventing the schism that would occur if access from one part of the community to another were severed by the freeway. (See Sts. & Hy. Code, §§ 100.2, 941.2, 1801.)

The exercise of control over streets and roads is an exercise of the sovereign power of the state. (*Ex parte Daniels* (1920) 183 Cal. 636, 639-641 [192 P. 442, 21 A.L.R. 1172].) Any right of control that is not expressly delegated to local government is retained by the state, and any grant of authority is strictly construed in favor of state control. (*Ibid.; Rumford v. City of Berkeley* (1982) 31 Cal.3d 545, 549-550 [183 Cal.Rptr. 73, 645 P.2d

124].) While local governments may be permitted to exercise some control over freeway overpasses as part of their local road system, the state retains control over those overpasses at least to the extent necessary or appropriate for the operation and use of the freeway for its intended purposes.

Accordingly, plaintiffs are not free of state control simply because they conduct their activities from freeway overpasses within the freeway right-of-way rather than upon the surface of the freeway itself.

"[F]orum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum [courts] have focused on the access sought by the speaker." (*Cornelius v. NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 801 [105 S.Ct. 3439, 3448, 87 L.Ed.2d 567, 579].) This entails consideration of the audience the speaker wishes to reach as well as the physical property from which the speaker wishes to act. (*Ibid.*)

Freeway overpasses are within the freeway rights-of-way, and by principles of general law, as well as by provisions of the Streets and Highway Code, they are under the control of the state for freeway purposes. Plaintiffs demand to use the overpasses for the sole and specific purpose of demonstrating to freeway traffic. The CHP excluded plaintiffs from the overpasses for the sole purpose of preventing them from demonstrating to freeway traffic. Consideration of both the nature of the property and the access sought by plaintiffs compels the conclusion that, in this respect, freeway overpasses, like freeways themselves, are not public forums.

## IV

Plaintiffs claim that the exclusion of their demonstrations from freeway overpasses has the effect of treating political speech less favorably than commercial speech, which is inconsistent with First Amendment values. (See *Metromedia, Inc. v. San Diego* (1981) 453 U.S. 490, 513 [101 S.Ct. 2882, 2895, 69 L.Ed.2d 800, 818]; *Metromedia, Inc. v. City of San Diego* (1982) 32 Cal.3d 180, 184 [185 Cal.Rptr. 260, 649 P.2d 902].) The contention is not persuasive.

In support of this assertion, plaintiffs point to provisions of the Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.), which permits off-site

advertising on private property, generally referred to as billboard advertising.[7] However, a private citizen's interest in controlling the use of his or her own property justifies different treatment from other types of expressive activity. (See *City Council v. Taxpayers for Vincent, supra,* 466 U.S. 789, 811 [104 S.Ct. 2118, 2132, 80 L.Ed.2d 772, 791].) Hence, the activity regulated by the act is not comparable to plaintiffs' activity, and need not be treated the same. In any event, the act flatly prohibits the placement or maintenance of any advertising display "within the right-of-way of any highway." (Bus. & Prof. Code, § 5403, subd. (a).)

Plaintiffs also point to on-site advertising, such as signs on commercial buildings adjacent to a freeway, which are not covered by the Outdoor Advertising Act (Bus. & Prof. Code, § 5272, subd. (d)) and which, plaintiffs claim, are unregulated. In fact, on-site advertising is subject to regulation by local government through ordinance. (Gov. Code, § 65850, subd. (b); Bus. & Prof. Code, § 5443, subd. (a).) But what is significant is that on-site advertising involves a property owner's interest in controlling the use of his or her property and, by definition, cannot be conducted within a freeway right-of-way. Hence, it is not comparable to the activity in which plaintiffs wish to engage.

As another example of commercial speech that is permitted along freeways, plaintiffs note that Caltrans places signs within freeway rights-of-way, advising motorists of traveler's amenities, such as gas, food, or lodging, that can be obtained by leaving the freeway at a particular offramp. At times, these signs include the name or logo of the particular purveyor of the goods or services available. These signs, like directional signs in general, convey information of importance to the traveling public and serve the intended purposes of a freeway. Where public property is not a public forum, government can permit communicative activity consistent with the property's intended purpose without opening the property to expressive activity in general. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at pp. 46-47 [103 S.Ct. at pp. 955-956, 74 L.Ed.2d at pp. 805-806].)

Plaintiffs also complain that their communication has been banned whereas some forms of otherwise unauthorized communication, such as commercial signs on the sides of city buses and bumper stickers on vehicles, are not excluded from the freeways. However, a lawful distinction may be

---

[7]"Off-site" advertising refers to the situation in which a property owner permits others, usually for a fee, to use the property to display messages, ordinarily but not necessarily commercial in nature. (See *Metromedia, Inc. v. City of San Diego, supra,* 32 Cal.3d at pp. 183-184.) In contrast, "on-site" advertising refers to a property owner's display of messages from his or her own property. (*Ibid.*)

drawn between (1) a motorist using the freeway for its intended purpose, consistent with the rules of the road demanded therein, who incidentally has a message attached to his or her vehicle, and (2) a person who does not wish to use the freeway for its intended purpose at all. (*Railway Express v. New York, supra,* 336 U.S. at pp. 109-110 [69 S.Ct. at pp. 465-466, 93 L.Ed. at p. 538-539]; see also *Lehman v. City of Shaker Heights* (1974) 418 U.S. 298, 301-302 [94 S.Ct. 2714, 2716-2717, 41 L.Ed.2d 770, 776-777].) The fact that some forms of incidental communication are not excluded from the freeways does not have the effect of opening the freeways to all forms of communication whether or not related to the intended purpose of those properties.

In the final analysis, it must be kept in mind that freeway rights-of-way are not public forums. In dealing with public property that is not a public forum, the state can exclude some types of expressive activity even though other types are permitted. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at pp. 46-49 [103 S.Ct. at pp. 955-957, 74 L.Ed.2d at pp. 805-807].) Unless, by policy or practice, the state has opened the property to the indiscriminate use of the general public for expressive purposes, the relevant question is not whether some forms of expression are permitted, but is whether the exclusion of the particular activity at issue is reasonable. (*Ibid.*; see *United States v. Kokinda* (1990) 497 U.S. 720, 733-734 [110 S.Ct. 3115, 3123-3124, 111 L.Ed.2d 571, 586].) In this respect, courts focus on the excluded activity and must recognize that the state is entitled to address activities it believes particularly warrant control without being required to address other, lesser evils. (*United States v. Kokinda, supra,* 497 U.S. at pp. 733-734 [110 S.Ct. at pp. 3123-3124, 111 L.Ed.2d at p. 586]; *Railway Express v. New York, supra,* 336 U.S. at p. 110 [69 S.Ct. at pp. 465-466, 93 L.Ed. at pp. 538-539].)

For reasons I already have explained, excluding demonstrations from freeway rights-of-way is reasonable.

V

As noted previously, the primary statutory authorities that the CHP witnesses cited at trial were sections 21465 and 21467. Section 21465 provides: "No person shall place, maintain, or display upon, or in view of, any highway any unofficial sign, signal, device, or marking, or any sign, signal, device, or marking which purports to be or is an imitation of, or resembles, an official traffic control device or which attempts to direct the movement of traffic or which hides from view any official traffic control device." An

"unofficial sign, signal, device, or marking" within the meaning of this section is one that is not placed, caused to be placed, or authorized by the Department of Transportation. (§§ 440, 445, 21350, 21400; Sts. & Hy. Code, §§ 230, 250.) Section 21467 authorizes the CHP to remove, or cause to be removed, every "prohibited sign . . . ."

Plaintiffs argue these sections do not provide authority for the CHP's enforcement action against them because, in plaintiffs' view, section 21465 does not, by its terms, apply to any signs other than those that purport to regulate traffic control or that block traffic control devices. They raise the specter that, if construed otherwise, section 21465 would permit the CHP to prohibit plaintiffs from displaying their signs and banners "in a manner viewable from any street." In essence, plaintiffs contend that, unless their construction of section 21465 is adopted, the statute is overbroad and therefore unconstitutional. This issue need not be addressed for the following reasons.

At trial, it was established that the CHP has not interfered with plaintiffs' expressive activities in any location other than on freeway overpasses. Plaintiffs brought this litigation for the specific and limited purpose of obtaining injunctive and declaratory relief that would compel the CHP to permit them to demonstrate on freeway overpasses. Their specific claim is that freeway overpasses are traditional public forums and, thus, their demonstrations cannot be precluded by the CHP. As the litigation has progressed, plaintiffs have begun to focus on sections 21465 and 21467. They appear to believe that if those sections are construed so as not to include their conduct, or are declared unconstitutional, plaintiffs will be entitled to the relief they seek.

Plaintiffs' argument presupposes that specific statutory authority is a prerequisite to the exclusion of demonstrations from within the freeway rights-of-way. It is not.

In addressing this issue, we must keep in mind that freeway rights-of-way, and freeway overpasses, are not public forums. Where a public forum is involved, a narrowly drawn statute or regulation is essential to exclude or limit expression. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 45 [103 S.Ct. at pp. 954-955, 74 L.Ed.2d at p. 804].) But the United States Supreme Court has not held that a statute or regulation is essential for the exclusion of expressive activity from property that is not a public forum. To the contrary, in non-public forum cases, the court has upheld exclusions that were not based on statute or regulation.

In *Lehman v. City of Shaker Heights, supra*, 418 U.S. 298 [94 S.Ct. 2714, 41 L.Ed.2d 770], the city operated a rapid transit system and sold advertising space for "car cards" on its vehicles. The city hired an agent to manage advertising space on its transit system. The contract provided that political advertising would not be allowed. (*Id.* at pp. 299-300 [94 S.Ct. at pp. 2715-2716, 41 L.Ed.2d at p. 775].) No statute, ordinance, or regulation was involved; there simply was a city policy reflected in the contract with its agent. Nevertheless, after concluding the city's transit system was not a public forum, the court upheld the exclusion as reasonable. (*Id.* at p. 304 [94 S.Ct. at pp. 2717-2718, 41 L.Ed.2d at p. 778].)[8]

In *Perry Ed. Assn. v. Perry Local Educators' Assn., supra*, 460 U.S. 37 [103 S.Ct. 948, 74 L.Ed.2d 794], a school district entered into a collective bargaining agreement that gave the teachers' union access to the district's interschool mail system and teacher mailboxes while denying such access to any other school employee organization. (*Id.* at p. 40 [103 S.Ct. at p. 952, 74 L.Ed.2d at p. 801].) No statute, ordinance, or regulation was at issue; there simply was a policy decision that was reflected in the collective bargaining agreement. After concluding that the internal mail system and teacher mailboxes were not public forums, the court upheld the exclusion as reasonable. (*Id.* at pp. 48-52 [103 S.Ct. at pp. 956-959, 74 L.Ed.2d at pp. 807-809].)

In *Arkansas Ed. Television Comm'n v. Forbes, supra*, 523 U.S. 666 [118 S.Ct. 1633, 140 L.Ed.2d 875], a state-owned public television station sponsored a debate between major party candidates for Congress, and excluded an independent candidate with little popular support. (*Id.* at p. 670 [118 S.Ct. at pp. 1637-1638, 140 L.Ed.2d at p. 882].) The exclusion was not pursuant to a specific statute, ordinance, or regulation; it simply was an exercise of discretion by station officials. (*Ibid.*) The court concluded that the debate was not a public forum (*id.* at p. 680 [118 S.Ct. at pp. 1642-1643, 140 L.Ed.2d at p. 889]) and upheld the exclusion as "a reasonable, viewpoint-neutral exercise of journalistic discretion consistent with the First Amendment." (*Id.* at p. 683 [118 S.Ct. at p. 1644, 140 L.Ed.2d at p. 890].)

In *Hazelwood School District v. Kuhlmeier* (1988) 484 U.S. 260 [108 S.Ct. 562, 98 L.Ed.2d 592], a school principal excluded two articles from a student newspaper. The exclusion was not based on a specific statute or regulation, but was simply an exercise of educational discretion. (*Id.* at

---

[8]The decision was rendered by a four-justice plurality. Justice Douglas concurred, expressing the view that the right of commuters to be free of forced intrusions on their privacy precluded the city from transforming its transit system into a public forum. (*Lehman v. City of Shaker Heights, supra,* at p. 307 [94 S.Ct. at p. 2719, 41 L.Ed.2d at p. 779].)

pp. 263-264 [108 S.Ct. at pp. 565-566, 98 L.Ed.2d at p. 600].) Finding the newspaper was not a public forum (*id.* at p. 270 [108 S.Ct. at pp. 567-570, 98 L.Ed.2d at pp. 604-605]), the court upheld the exclusion because the principal's action was reasonable under the circumstances as he knew them. (*Id.* at p. 276 [108 S.Ct. at pp. 572-573, 98 L.Ed.2d at p. 608].)

As these decisions demonstrate, when property is not a public forum, the exclusion of expressive activity need not be based upon a specific, narrowly drawn statute or regulation. An exclusion can be based upon such things as a policy decision or the exercise of official discretion.

Accordingly, the CHP's authority to prohibit plaintiffs from demonstrating on freeway overpasses is not necessarily dependent upon the interpretation and constitutional validity of sections 21465 and 21467.

In establishing a freeway system, the Legislature took steps to ensure that the public use of freeways would be limited to the intended purpose of freeways. Thus, as I have noted, access is limited and controlled. (§ 21664; *Schnider v. State of California, supra*, 38 Cal.2d at p. 442; *People ex rel. Dept. of Transportation v. Wilson, supra*, 25 Cal.App.4th at p. 982.) Pedestrians, bicyclists, and other slow modes of transportation generally are prohibited. (§ 21960.) Motorists cannot stop (§ 21718) or make a turn (§ 21651). There are often minimum as well as maximum speed limits on freeways. (§ 22400, subd. (b).) And the Legislature has excluded commercial activity from the freeway rights-of-way. (§ 22520.5, subd. (a).)

The Legislature has expressly delineated the types of signs and markers that can be placed or maintained within the freeway rights-of-way. (See, e.g., § 21375; Sts. & Hy. Code, §§ 100.9, 101, 101.1, 101.6, 101.7, 101.8, 101.9, 123.5, 131.5.) As part of the Outdoor Advertising Act, the Legislature expressly precluded any advertising sign from being placed or maintained within the freeway rights-of-way. (Bus. & Prof. Code, § 5403, subd. (a).) Although Caltrans has full possession and control of the freeways (Sts. & Hy. Code, § 90), it has been given no statutory authority to place, maintain, or authorize any sign or marker other than those delineated by the Legislature. Neither Caltrans nor the CHP has been given statutory authority to authorize or permit the freeway rights-of-way to be used for expressive purposes, like protests or demonstrations.

The CHP is the law enforcement agency with full responsibility and primary jurisdiction for the administration and enforcement of the laws on freeways. (§ 2400, subd. (d).) The CHP's duties include the enforcement of all laws regulating the operation of vehicles and the use of the freeways.

(§ 2400, subd. (b).) It is required to "perform all duties, exercise all powers and jurisdiction, assume and discharge all responsibilities, and carry out and effect all purposes vested by law in the department." (§ 2108.) This includes providing adequate patrol of the freeways at all times of the day and night. (§ 2401.) "Members of the [CHP] are authorized to direct traffic according to law, and, in the event of a fire or other emergency, or to expedite traffic or insure safety, may direct traffic as conditions may require notwithstanding the provisions of this code." (§ 2410.) Traffic includes pedestrians. (§ 620.)

These statutory provisions make it clear that the CHP has the responsibility to patrol the freeways and to take action to ensure the safe and efficient movement of traffic thereon. In performing this duty, a CHP officer may give any order, signal, or direction that is relevant and reasonably necessary to the accomplishment of that purpose. (*People v. Ritter* (1980) 115 Cal.App.3d Supp. 1, 6 [170 Cal.Rptr. 901].) And it is unlawful for any person to willfully fail or refuse to comply with any lawful order, signal, or direction by a CHP officer. (§ 2800.)

Having considered the totality of the circumstances and the law applicable to this case, I conclude that, without relying on sections 21465 and 21467, the CHP can prevent plaintiffs from demonstrating to freeway traffic from freeway overpasses. I reach this conclusion for the following reasons: (1) freeways and freeway overpasses are not public forums, and plaintiffs have no right to demonstrate to freeway traffic from within the freeway rights-of-way; (2) the Legislature consistently has acted to exclude from the freeway rights-of-way all objects and activities that are not related to the purpose of providing a means of uninterrupted rapid transit for through traffic; (3) the Legislature has not authorized Caltrans or the CHP to permit unrelated expressive activities within freeway rights-of-way; (4) the CHP has broad responsibility over the freeways, and its duties include taking action to promote the safe and efficient flow of traffic on the freeways; (5) it was established at trial, and it is a matter of common sense, that demonstrations directed at freeway traffic from within the freeway rights-of-way can have a serious deleterious effect on both traffic safety and efficiency; and (6) in the performance of their duties, CHP officers may issue orders, signals, and directions relevant and reasonably necessary to the accomplishment of their responsibilities.

It follows that the CHP has authority to preclude plaintiffs from demonstrating to freeway traffic from freeway overpasses, regardless of any determination that we might reach with respect to the interpretation and constitutional validity of sections 21465 and 21467.

VI

Although, in my view, sections 21465 and 21467 are not determinative of the issues presented, I pause here briefly to note my disagreement with the majority's interpretation of those statutes.

Section 21465 provides: "No person shall place, maintain, or display upon, or in view of, any highway any unofficial sign, signal, device, or marking, or any sign, signal, device, or marking which purports to be or is an imitation of, or resembles, an official traffic control device or which attempts to direct the movement of traffic or which hides from view any official traffic control device."

In the statute, the Legislature used the words "sign, signal, device, or marking" twice, separated by the disjunctive "or." The first iteration is preceded by the qualifier "unofficial"; while the second refers to those that are related to traffic control devices. From the repetition of the words, with the "unofficial" qualifier limited to the first usage, it appears that the Legislature understood unofficial signs to refer to signs other than those related to traffic control devices.

The majority's interpretation of section 21465 limits its reach to signs related to traffic control devices, thus rendering the words "unofficial sign, signal, device, or marking" surplusage. But what has been called a cardinal rule of statutory construction dictates that courts must avoid an interpretation that would make some of the statutory words surplusage. (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; *People v. Gilbert* (1969) 1 Cal.3d 475, 480 [82 Cal.Rptr. 724, 462 P.2d 580].) In construing the statute, we must, if it is possible, give effect to the words "unofficial sign, signal, device, or marking."

A statute should not be read in isolation; rather, it must be construed together with other statutes on the same subject. (*California Real Estate Loans, Inc. v. Wallace, supra*, 18 Cal.App.4th at p. 1582.) With respect to freeways, which are the properties at issue here, there is statutory guidance as to what constitutes an unofficial sign, signal, device, or marking.

Under the Legislature's scheme for freeways, the Legislature by statute directs or authorizes Caltrans to place or maintain certain types of signs within the freeway rights-of-way. (§ 21350.) While Caltrans is concerned

with traffic control signs and devices, that is not exclusive. The department's authority extends to signs, signals, and markings "as may be necessary properly to indicate and to carry out the provisions of this code, or to warn or guide traffic upon the highways." (§ 21350.) Specific signs or markings that may be maintained or authorized by Caltrans include markings to direct visitors and tourists to points of local interest (§ 21374), signs indicating the off-ramp which may be used to reach postsecondary educational institutions (§ 21375), informational signs concerning rail transportation services and fire station access (Sts. & Hy. Code, §§ 101.8, 101.9), and informational signs concerning the availability of fuel, food, lodging or camping (Sts. & Hy. Code, § 101.7). Caltrans is not given the power to place or maintain, or authorize to be placed or maintained, signs that are not related to the purposes of freeways for travel and that are not statutorily authorized.

The word "official" denotes something that is done under color or by virtue of a public office rather than privately. (*People v. Norris* (1985) 40 Cal.3d 51, 55 [219 Cal.Rptr. 7, 706 P.2d 1141].) It follows that "unofficial" refers to things or actions that are private and are not under color or by virtue of a public office. Accordingly, in light of the legislative scheme for freeways, it appears that an unofficial sign, signal, device, or marking is one which is not authorized by the Legislature or placed or authorized by Caltrans in the exercise of its administrative authority over freeways. (§ 21350, Sts. & Hy. Code, §§ 230, 250.) To conclude otherwise would render Caltrans's authority illusory, since there would be no requirement of the department's approval for the private placement or display of signs, signals, devices, or markings that are not related to traffic control devices.

In any event, as I have previously noted, the removal authority conferred by section 21467 is not necessarily limited to the prohibitions of section 21465. Hence, a narrow construction of section 21465 does not in itself establish a right in the plaintiffs to display signs from within the freeway rights-of-way.

During appellate proceedings, plaintiffs have suggested that, because section 21465 is not limited to freeways, an interpretation of its provisions that would include plaintiffs' conduct would be unconstitutionally overbroad because the statutes would prohibit demonstrators from engaging in the protected activity of displaying the signs in the view of streets that are traditional public forums. This court asked the parties, through supplemental briefing, to address the question whether section 21465 is overbroad and, if so, whether the overbreadth can be cured through judicial decision. Since

neither my view nor the majority's view of the controversy requires us to consider such questions, I will not venture an opinion on them. I simply note that, in the trial court, plaintiffs did not raise the overbreadth issue, nor did they specifically challenge the constitutionality of section 21465. And plaintiffs did not allege, or attempt to prove, that they have, or anyone else has, been prohibited or deterred from engaging in expressive activity anywhere other than on freeway overpasses. In fact, the evidence showed that plaintiffs have conducted their demonstrations without interference on streets and highways within Sacramento, and were restricted only with respect to freeway overpasses. Besides, there is no "realistic danger that [section 21465] will significantly compromise recognized First Amendment protections of [plaintiffs or] parties not before the Court for it to be facially challenged on overbreadth grounds." (*City Council v. Taxpayers for Vincent, supra,* 466 U.S. at p. 801 [104 S.Ct. at p. 2126, 80 L.Ed.2d at p. 784].) The development of the law applicable to public forums and the unequivocal judicial precedents establishing an ordinary and conventional street as a public forum make it decidedly unlikely that any agency or local jurisdiction would attempt to apply section 21465 to prohibit expressive activity in such a traditional public forum.

## SUMMARY

Freeways and freeway overpasses within the freeway rights-of-way are not public forums. Plaintiffs have no constitutionally protected right to demonstrate to freeway traffic from a location within the freeway rights-of-way. The CHP has the authority to preclude them from doing so. The exclusion of demonstrations from within the freeway rights-of-way promotes the safe and efficient use of freeways for their intended purpose and is reasonable. The evidence in this case established that the CHP applies the policy in a content-neutral, across-the-board manner, and nothing in the record suggests that the CHP was attempting to suppress a particular point of view.

In reaching these conclusions, I limited my consideration to the record before us. If it were shown that, by policy or by practice, the state had opened the freeway rights-of-way to indiscriminate use by the general public, this would be a different case. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. at p. 47 [103 S.Ct. at p. 956, 74 L.Ed.2d at p. 806].) If it were shown that the CHP engaged in selective enforcement in an effort to suppress particular points of view, this would be a different case. (*Id.* at p. 46 [103 S.Ct. at pp. 955-956, 74 L.Ed.2d at p. 805].) But nothing in the record before this court would support such findings.

Accordingly, I agree with the trial court that the CHP may properly preclude plaintiffs from demonstrating to freeway traffic from freeway overpasses. Thus, I would affirm the judgment in its totality.